## HARRISON v. SHREVEPORT YELLOW CAB CO., Inc.

### No. 4314.

Court of Appeal of Louisiana. Second Circuit

June 29, 1932.

Foster, Hall, Barret & Smith, of Shreveport, for appellant.

Wilkinson, Lewis & Wilkinson, of Shreveport, for appellee.

DREW, J.

Plaintiff alleges that defendant is indebted unto her individually in the sum of $1,500; as tutrix of her minor son, in the sum of $10,000, less a credit of $100, and 5 per cent. per annum interest on the full amount from judicial demand until paid.

She alleged that on June 18, 1929, her six year old child was walking across Southern avenue at a point where said avenue intersects Wilkinson street; that he was walking east on the south side of Wilkinson street and had nearly arrived at the east side of said Southern avenue, when a taxicab, owned and operated by the defendant, traveling south on Southern avenue, on the east or left-hand side of said street, at an excessive rate of speed, negligently and wrongfully was driven against the child, hurling him to the pavement and dragging him a distance of approximately forty feet. The acts of negligence are set out in articles VIII and IX of plaintiff's petition as follows:

"That specifying the negligent, reckless and unlawful operation of said cab, your petitioner shows:

"1. That and at the time of said accident, said taxicab was being operated at a speed of 35 miles per hour;

"2. That said taxicab was operated at such speed and without reduction of speed, into and across a populous intersection, plainly marked by white lines on the pavement as a school crossing, and with the word 'SLOW';

"3. That the driver of said cab, despite the fact that the intersection ahead of him was occupied both by pedestrians and motor traffic, and in violation of police warnings by white lines and the word 'SLOW' painted on the pavement, was attempting to pass a car moving south on Southern Avenue in the same direction as the cab, just before entering the intersection, and that in so doing the driver of the cab veered and turned to the left or east side of the center of Southern Avenue and crossed said intersection on the left side of said avenue;

"4. That the driver of said car failed to keep a proper lookout, in that another car was crossing Southern Avenue going east on Wilkinson Street, which other car, as the driver of the taxicab well knew, partially obscured his vision on the intersection; but that despite the situation which required care, the driver of the cab drove into the intersection without reduction of speed and on his left side of the roadway, narrowly missing the other automobile crossing his path, and drove against Lawrence Bright, Jr., on the left side of Southern Avenue;

"5. That the driver of said car under all the conditions shown, recklessly failed to keep his car under proper control or in its proper path on the right side of the roadway and failed to apply the brakes until too late to prevent striking petitioner's minor child.

"IX. That the manner of operation described in Articles VII and VIII herein was done and committed negligently, wrongfully, and with reckless disregard of the standard of care required under the conditions and circumstances existing at the time and place, and in violation of law, and in violation of Ordinances No. 207 and 110 of the City of Shreveport."

Plaintiff specifically sets out the injuries claimed to have been received by the child in the accident, and prays for damages, as tutrix of the child, as follows: Physical injuries, $5,500; pain and suffering, $1,000; impairment of mental function and capacity for future work, $2,400; medical expense already incurred, $100. And she itemizes her individual claim as follows: For loss of future support through and by her minor child,

$750; and for support of the minor child in the future, by reason of mental injury to said child, $750.

An exception to the citation was filed by defendant, tried by the lower court, and overruled. The exception is not urged here. A plea of prescription of one year was filed by defendant and overruled, and is not urged here. A plea of vagueness was also filed and disposed of by the lower court, and defendant does not urge it in this court.

Defendant in answer denied all the allegations of negligence made by plaintiff. It alleged that its driver was operating the taxicab in a careful and prudent manner; that plaintiff's child suddenly ran out from between two cars, into the path of the taxicab, and was struck before the driver could stop; that the cab was being operated at twelve miles per hour, and the driver did all he could to avert the accident; and that the driver veered the cab to the left to avoid striking the child; that the taxicab stopped at the intersection to permit another car to pass in front of it and had just shifted from low to high gear, when the child ran in front of the taxicab; that the child was not attempting to cross the street at the place where pedestrians were supposed to cross, but was at a point below the regular crossing; that, immediately upon seeing the child, its driver applied the brakes, which were in good order and which took effect immediately.

On these issues the case was tried below, resulting in judgment for defendant, rejecting the demands of plaintiff, and from which judgment plaintiff has appealed to this court.

Southern avenue is a street running north and south in the city of Shreveport. Wilkinson street runs east and west and intersects Southern avenue. On the southeast corner of the intersection is located a filling station, operated by. Mr. Kinkaid; on the southwest corner, there is a drug store; on the northeast corner, a dwelling; and the northwest corner is vacant. There are two street car tracks on Southern avenue, and at the intersection of Wilkinson street, there is a "Stop" sign, and on Southern there is a "Slow" sign. Defendant's taxicab, driven by C. W. Dingman, was traveling south on Southern avenue, and the child who was struck by the cab was proceeding on foot from the west side of Southern avenue to the east side of said street. Southern avenue at this point is 37 feet wide. There were parked at the time on the west side of Southern avenue two cars, which were directly in front of the drug store. The cars were parked parallel with the sidewalk and occupied a space in the street, extending out from the sidewalk, of about six feet.

The taxicab was trailing a Buick sedan until both arrived at the intersection, when the Buick turned west (to its right) on Wilkinson street. At the same time, there was a car, driven by Clarence Bennett, crossing the intersection, going east. As the Buick slowed down and pulled slightly to the left to turn into Wilkinson, the taxicab driver, who was trailing the Buick by about five feet, veered the taxicab to the left and passed to the rear of the then turning Buick and about four feet to the rear of the car driven by Bennett, which had just cleared the path of the taxicab. At this moment, the child, who was attempting to cross the street, was seen by the cab driver, who immediately put on his brakes and veered his car farther to the left to avoid striking the child. However, his efforts were unsuccessful, and the center of the bumper struck the child and knocked and rolled it for a great distance before the taxicab was brought to a stop near the sidewalk, on the east side of Southern avenue, approximately 40 to 60 feet south of the southern line of the intersection.

The only witnesses to the accident or as to what occurred just prior to the accident are Mrs. Gillespie, who was crossing Southern avenue at Wilkinson street, going west; Clarence Bennett, who was driving the car going east on Wilkinson street; a girl, who was in the car with Bennett, by the name of Addie Gill; Mr. Kinkaid, who operated the filling station on the southeast corner of the intersection; and C. W. Dingman, the taxicab driver. There was a passenger in the taxicab who refused to give his name to the driver, and was not summoned or used as a witness.

Plaintiff offered the testimony of Mrs. Gillespie, who crossed Southern avenue at Wilkinson just prior to the accident. She saw the taxicab coming down Southern avenue when it was two blocks away. It was trailing just behind another car, which it passed upon reaching the intersection of Southern avenue and Wilkinson street. She testified that the cab was traveling at the rate of 30 to 35 miles per hour, and did not slow down at the intersection. Before it passed the other car, the taxicab was traveling on the street car track in the center of the street. She testified that when the cab passed her the speed was sufficient to "fan her skirts." She did not see the accident.

Clarence Bennett testified that he was traveling east on Wilkinson street, and that Addie Gill was in the car with him. On arriving at the intersection with Southern avenue, he brought his car to a stop, and the child started across the street at the same time that he did and was walking within the lines marked for pedestrians; that the child kept abreast of his car, which was traveling very slowly in low gear, until he reached the center of the intersection, that is, halfway across the intersection, when he (Clarence Bennett) saw approaching the intersection the Buick car, and, just behind the Buick,

the taxicab. The approaching cars were about 50 feet from the intersection at that time and were traveling at a rate of speed of 30 to 40 miles per hour; and, in order to clear the way for the speeding cars bearing down on him, he increased his speed to about ten miles per hour. As the Buick car reached the intersection, it reduced its speed slightly to make a right-hand turn into Wilkinson street, and at that time the taxicab pulled out to the left and went around the Buick, as it was turning, and passed within three or four feet of the rear of his car. The on-coming taxicab, behind the Buick, was in the middle of the street when he first saw it 50 feet from the intersection; and that the taxicab driver did not attempt to slow down on approaching the intersection. He testified that when he accelerated the speed of his car to get out of the way of the on-coming cars, he left the child behind him and exposed to the on-coming cars. As soon as he had crossed out of the way of the on-coming cab, he heard the brakes of the cab squeak. He stopped at once and looked back, and saw that the taxicab had struck the child. The taxicab was still moving when he looked back, and finally stopped about eight feet from the sidewalk, on the east side of Southern avenue, about 37 feet south of the sidewalk line. Bennett testified that he measured the skid marks made by the taxicab after the brakes were applied, and found they began about 1½ feet in the intersection from the inside sidewalk line, on the south side of the intersection, and continued for a distance of 37 feet 7 inches. The child, when struck by the cab, was on the east rail of the east street car track.

Addie Gill, the next witness for plaintiff, testified that she was in the car with Clarence Bennett, riding on the front seat. She fully corroborates Bennett in his evidence as to the boy starting across the street and walking abreast of their car; as to the speed of the on-coming taxicab, its failure to slow down for the intersection, and as to being in the middle of the intersection when they saw the on-coming taxicab, and that they speeded up to get out of its way. She heard the brakes on the taxicab squeak, and they stopped. She testified that at the time they stopped, to use her own language: " * * * We knowed that the boy couldn't help but be hit and we heard it and we stopped just that minute. * * * After we crossed, because after we crossed that left the boy in the clear for the cab." She then said she looked and saw the taxicab strike the boy, and that he was about the center of the street when he was struck.

Lawrence Bright, Jr., the child who was injured, was placed on the stand. However, his testimony is of no value. The record discloses that he did not know what struck

him until he was told after he recovered consciousness. He never saw the taxicab.

Defendant first offered the testimony of C. W. Dingman, who testified that he was driving the taxicab south on Southern avenue; that he had been trailing a Buick car for about six blocks; that he remained a distance of about five feet behind the Buick, until he reached the intersection; that he knew the speed limit, as fixed by ordinance of the city of Shreveport, on Southern avenue, was 23 miles per hour; admitted that before getting to Wilkinson street, and while trailing five feet behind the Buick car, he was traveling 27 to 28 miles per hour; and that when he approached the intersection of Southern avenue and Wilkinson street he was traveling 20 miles per hour. He testified that the driver of the Buick car held his hand up, signaling for a right-hand turn into Wilkinson, and he slowed down and went around him, as he was turning. He claims he was driving down the west street car track, and that the taxicab could not exceed 35 miles per hour.

Dingman further testified that he was exceeding the speed limit when within two blocks of Wilkinson street, and said: "When I was within 100 feet of Wilkinson, I had my foot on the brakes on account of the Buick in front of me and cars passing the corner of Wilkinson and Southern there all the time." He claimed to have had complete control of the taxicab. He stated that, after he passed around the back of the Buick, he saw the car driven by Bennett and he put his car in second gear and slowed down until Bennett's car, passed, and that he then passed four to five feet to the rear of Bennett's car. The following questions were asked him, and his answers are as follows:

"Q. After that car proceeded to cross Southern Avenue, what did you do? A. Well I put my car in second. I had it in second then and I had to stop. I put it in second so I could go ahead and when I did, the first thing I knew there was a little boy started running and he darted directly in front of me.

"Q. Where did he run from? A. Between the two cars parked in front of the drug store. I think it was the Whitley Drug Store and they were parked in front on Southern Avenue.

"Q. Did you see anybody crossing the street within the white lines marked for passengers there? A. No, sir.

"Q. Did this little boy run out between the white lines? A. No, sir, he run out on the last line south of Southern. There is two lines there and he run over the last one. There is a slow sign about three or four feet from the line there and he was about on that slow sign zone.

"Q. Let's see, then there were three lines? A. No, sir, just two.

"Q. Two lines and then the slow sign? A. The slow sign before you get to the two lines going north on Southern.

"Q. The slow sign is where he ran out? A. Yes, sir.

"Q. I just want to get that straight. How far were you from the two cars parked at the curb there when he ran out between them? A. Well, I was no more than—well, just the clearance of them, just about as much as the street car coming clearing the cars themselves.

"Q. What did you do when you saw the boy run out in front of you? A. I tried to pass him and instead of that, he kept running towards me. I saw it was going to be inevitable and I didn't want the wheel to run over him so I let the middle of the bumper hit him. He darted out on me so quick that I didn't realize he was there until he was right on me. I had to twist real quick all I could and I put on the brakes and the brakes locked right then.

"Q. You turned your car to avert hitting him? A. Yes.

"Q. Well, when you saw you were going to hit him you turned your wheels? A. Yes, to center him so I wouldn't run over him with the wheels.

"Q. How far did your car go after you struck him?. A. My car didn't go but a car length from him after I struck him. I looked back to see and he was laying in the street. So I pulled out of the way and went back and then someone picked him up. I told him to put him in my car. He was hollering for somebody to go get his mother, said he was hurt."

He testified that at the time he saw the child he was traveling about twelve miles per hour, and that he put on his brakes immediately. He also testified that the child was three or four feet into the street, darting and jumping, when he first saw him. He said his car was about halfway across Southern avenue, headed east, when he stopped; that he was about four feet from the child when he first saw him, and that he went two car lengths, after striking the child. Dingman later testified that the distances were not accurate and were only estimates.

The witness' testimony as to the speed he was traveling when he slowed down, is as follows:

"Q. And your statement is, Mr. Dingman, that you did not exceed the speed limit of twenty-three miles an hour at any time coming down the street there? A. No, I exceeded it three or four miles an hour before I come around that Buick. I stayed five feet behind the Buick all the time and when he slowed down I slowed down.

"Q. Where did he slow down, for the turn? A. For the turn.

"Q. You state you were exceeding the limit up above that? A. About four miles.

"Q. About four blocks, you say? A. No, about four miles an hour.

"Q. Oh, yes. You knew what the speed limit was, did you not? A. Yes, twenty-three miles.

"Q. What was it? A. Twenty-three miles.

"Q. You knew that the city ordinance so provided? A. Yes.

"Q. And according to your statement you did not cut down below the speed limit until the Buick started to turn? A. No, I had plenty of time to cut that down because my brakes were working good and I knew how far I could go without losing control of the car.

"Q. I know, but you did not slow down to the speed limit until the Buick slowed down to start to turn? A. Until the Buick slowed down too. I had to slow down because I could not pass it."

He testified that he was directly behind the Buick a distance of five feet, until he reached the intersection; that the Buick had him blinded from seeing Bennett's car at first; that when he pulled around the Buick, the Essex, driven by Bennett, was directly in front of him and only a few feet from him. He thinks two feet is not too close to approach a moving car passing in front of him, when his own car is also moving.

Defendant's other eyewitness to the accident was the filling station operator, Mr. Kinkaid. He testified that he was standing in front of his station on Southern avenue, at the corner of Southern avenue and Wilkinson street, and saw the accident. The squeaking of the brakes attracted his attention, and, when he looked up, the child had come out from between two parked cars in front of the drug store. He was coming right across the zoning line where it says "School Crossing." This zoning line was south of the line marked for pedestrians to use. It was 27 feet from the corner, as near as he could fix it. He was asked the following question:

"What did the negro boy, who was injured, do or what was he doing when you first saw him? A. He had left the curb just as I looked up. He had left the curb between two cars that was parked in front of the drug store and undertook to get across the street and he ran past a car that was close to him, and as he passed in front of that car he didn't seem to see the taxi that was passing this car at the time and the boy still kept running across the street instead of stopping. The man in the taxi, it seemed like he thought the boy would stop and he turned to the left and the boy kept running and ran in front of the car."

He testified that the child was 30 or 40 feet from the taxicab when he first saw him, and that the cab was traveling at a rate of speed

of 35 miles per hour; that the child was on the last street car rail on the east side of the street when struck by the taxicab, and was struck by the center of the front bumper. The taxi driver set his brakes as he was. passing the Buick, and this squeaking attracted his attention. He was just out of the intersection, when the brakes were set. The skid marks on the pavement measured 57 feet in length. When the cab stopped after the accident, it was parked at the east curb of Southern avenue. He answered, in reply to a question, as follows: "When the cab struck him it knocked him about 18 or 19 steps there and the boy hit the ground and rolled. The man driving his car turned his wheels trying to keep from running over him with the wheels. When the front axle passed over him, it turned him and then hit him and turned him again. That left the boy laying about 19 steps from where he was when the cab struck him."

It developed on cross-examination that the distance from the zoning line to the sidewalk line was not definitely fixed by the witness. When he fixed the distance of 27 feet, he was referring to the corner of the curb, and the sidewalk line was between the corner of the curb and the zoning line. He fixed the width of Southern avenue at 37 feet and the parked cars in front of the drug store as occupying about six feet of the street, thereby leaving an open street of 31 feet. He also testified that there were a great many children who pass back and forth across this intersection, there being a drug store, a Piggly Wiggly Store and a meat market on the west side of Southern avenue and near the corner of the intersection. The taxi driver testified there were a great many cars that pass this intersection, and that he was thoroughly familiar with this fact, having passed there many times himself.

We have attempted to recite all the relevant testimony to this accident, due to the fact that we feel it our duty to reverse the lower court on a finding of fact, which we are reluctant to do, and only where the lower court's finding of fact is clearly erroneous, as we think it is in this case, will we disturb its finding.

Unless we disregard all testimony of both plaintiff and defendant, except the taxi driver's testimony, we are forced to the conclusion that the taxi was driving at a rate of 35 miles per hour when it reached the intersection, and that the driver made no attempt to slow the speed of the taxicab until after he saw the child. This rate of speed is fixed by all witnesses, except the taxi driver, and in corroboration of the speed is the mute evidence, the skid marks on the pavements. Plaintiff's witness testified that the skid marks extended from just inside the intersection to a point 37.7 feet south of the intersection. Its witness, Mr. Kincaid, testified

that the skid marks extended from just outside the intersection to a point 57 feet south of the intersection. The taxi driver testified that .the brakes on the taxi were working properly, and that immediately upon applying the brakes the wheels locked. The physical facts are, therefore, strong corroboration of the testimony that the taxi was traveling at a fast rate of speed, and completely destroys the testimony of the taxi driver that he was traveling in second gear, at a rate of twelve miles per hour. The taxi had been trailing a Buick car for six blocks, and only five feet behind the Buick. The taxi driver admits that his speed was 27 to 28 miles per hour, until the intersection was reached, and the Buick slightly reduced its speed to make a right turn. He admits that he knew the speed limit on Southern avenue was fixed by city ordinance at 23 miles per hour, and there was a "Slow" sign at this intersection, which was not observed by the driver.

We are convinced that the speed of the taxicab was excessive on reaching the intersection, and there was no attempt to reduce the speed before crossing the intersection; that the Buick slightly reduced its speed to turn to the right; that the driver cut to the left out from behind the Buick to prevent striking it in the rear, due to the unreasonably close proximity of the Buick. The taxicab driver was familiar with the great amount of traffic at this intersection, as well as the number of children and pedestrians who make use of this corner. Nevertheless, when he entered the intersection, his view of it was obstructed by the Buick just five feet ahead of him. When he turned out from behind the Buick to the left side of Southern avenue, his view was further obstructed by the Essex car, driven by Bennett, which was directly in front of him, and, from the time he approached the intersection until the Essex car driven by Bennett cleared his path, he could not see past the intersection. Under these conditions, he failed to reduce his speed and continued on his way in utter disregard of the rights of others to use the street.

Regardless of the city ordinance fixing the speed limit at 23 miles per hour and the "Slow" sign on Southern avenue, the speed the taxicab was being driven on approaching the intersection; his failure to reduce the speed, after entering the intersection, his view being obstructed as it was; and his leaving his regular path of travel on the right side of the street, cutting out from behind the Buick on the left side of the street, were gross carelessness and negligence, amounting to recklessness and utter disregard of the rights of others, whether traveling in vehicles or on foot. We therefore conclude that the allegations of negligence made by plaintiff were fully sustained in every respect by the evidence.

Defendant contends that the child was not attempting to cross the street at a point where pedestrians are supposed to cross, and that, since he was attempting to cross in the middle of the street, the taxi driver did not owe him the duty of as much care as it would had he been in the white lines marked for use by pedestrians. While this contention may be true, it does not mean that the driver should not keep a lookout for pedestrians at all times, or that he could blindly run down any one who attempts to cross the street at a point other than an intersection. It is not shown that there is a city ordinance prohibiting the crossing of pedestrians at any place, other than the lines marked for their use at the intersection. It was the duty of the driver of the taxi to keep a proper lookout at all times; to know what was in front of him, at least for a reasonable distance in front of him.

Bennett and Addie Gill both testified that the child was in the white lines used by pedestrians, and are corroborated to a certain extent by defendant's witness, Mr. Kinkaid, who testified that the child was knocked 57 feet by the car when struck, which is the exact distance he says the car skidded, and the skid marks began just outside of the intersection. However, we have come to the conclusion that the child was a few feet south of the line marked for pedestrians. That fact is, however, immaterial to the case. If he had been in the white lines, he would have been struck sooner than he was, and possibly before the speed of the car had been checked by setting the brakes. The fact that he was a few feet south of the intersection possibly accounts for the fact that he is alive today.

The contention of defendant that the child ran out in front of the taxicab so close to it that the driver could not stop is not well founded. The street at that point is 37 feet wide. Two street car tracks are in the street. There was 31 feet in the clear. About six feet of the street was taken up on the west side by two automobiles. The child when struck was on the east, or left of the east or left street car track, at least two-thirds of the way across the street. If the driver had been keeping a proper lookout, he could have seen the child all during the time it was traveling from a point six feet from the west curb of the street, to the place where he was struck, a distance of at least 15 to 20 feet; and while the child was traveling 15 feet, the taxi, at the speed it was going, would have traveled three or four times as far, and if he had been driving the taxi with the proper care and caution, commensurate with the conditions prevailing at this intersection, he would have had no difficulty in avoiding the accident. If the taxicab had been on its right side of the street, where it was re-

quired to be, the accident would never have happened. It was the duty of the taxicab driver, when he discovered the Buick was going to turn out of Southern avenue, to reduce the speed of the taxicab, let the Buick pass out, and then continue on his regular way, on the right-hand side of the street. It was negligence for him not to do so. The injured child was only six years old at the time of the accident, and there is no plea of contributory negligence.

The defense is founded on the claim that the taxi driver was free from any negligence, and the action of the child made the accident unavoidable.

We are convinced that the driver of the taxi was negligent and reckless and that his negligence was the sole proximate cause of the accident; that the accident was avoidable and would not have occurred but for the negligence of the taxi driver. The defendant is therefore liable for any damages growing out of said accident.

We think plaintiff's claim for damages is out of proportion to the damage done. We will not review in detail the testimony as to damage, but will merely state our conclusion. It is almost unbelievable that the child could escape from such an accident with so little injury, and without some broken limbs. We will say here that the damage claimed by the child's mother has not been proved, and will be rejected. The child was bruised and lacerated, and received a simple fracture of the frontal bone of the skull. He remained in the sanitarium for eight days, when he was removed home, and soon was fully recovered. There is no bad effect as the result of said fracture. He is attending school and has made a grade each year since. The expected bad results from said fracture, upon which plaintiff is claiming the principal amount of damage, is purely problematical and has not been proved. The medical expense incurred has been paid by defendant and will be considered in making this award. No doubt the child was greatly shocked and suffered a great deal. We think $1,000 is a just award for the use and benefit of the child for pain and suffering and physical injuries, and that the other item of damage claimed should be disallowed.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be reversed, and that there now be judgment in favor of plaintiff for the use and benefit of her minor son, Lawrence Bright, Jr., and against defendant, Shreveport Yellow Cab Company, Inc., in the full sum of $1,000, with legal interest from judicial demand until paid; and for all costs.

PALMER, J. concurs.