## LAMBERT v. CIRE et al.

### No. 16787.

Court of Appeal of Louisiana.  Orleans.

Feb. 21, 1938.

Robert L. A. Indest and Gordon Boswell, both of New Orleans, for appellants.

Stirling Parkerson, of New Orleans, for appellee.

JANVIER, Judge.

Leonard P. Jefferson, slightly more than fifteen years of age and unusually intelligent for his age, was severely injured when the bicycle which he was riding either was struck by an automobile which approached from his rear, or swerved to his left and into the side of the automobile just as it was about to pass him.

The most important, in fact the pivotal question of fact is that suggested by the alternative statement set forth above, i. e., Did the automobile strike him from the rear, or did he swerve his bicycle to its left and into the side of the passing automobile? He was riding on Canal street toward the Mississippi river and was in the block between South Robertson and Villere streets. To his right, alongside the curb, was a continuous line of parked automobiles, most of which were standing parallel to the curb. Two or three of them—used or secondhand cars being displayed for sale—had been placed in an unusual position, standing at a right angle to the sidewalk with their rear ends partially on the sidewalk and with their front ends towards and extending a few feet into the paved portion of the street. Somewhere near the center of the block and in front of a used or secondhand car lot there was still another stationary car, which, having exhausted its gasoline supply, had been temporarily abandoned by its occupants alongside the row of stationary cars and directly in the path of the bicycle ridden by young Jefferson. We shall refer to this automobile as the "stalled car." The automobile driven by Cire, the defendant, was some distance in the rear of Jefferson as he approached the stalled car, which blocked his passage, but there is a dispute as to whether the Cire car was nearer to the neutral ground than was Jefferson, or was directly in line behind him. As Jefferson turned to his left, finding it necessary to do so in order to go around the stalled car, he came into contact with the Cire car, was knocked to the street and received serious injuries.

Jefferson's mother, his father being dead, having been judicially confirmed as his natural tutrix, brought this suit on his behalf, charging that the proximate cause of the accident was the negligence of Cire.

Gulf Insurance Company of Dallas, Tex., and Katz & Besthoff, Limited, are also made defendants, the former being alleged to be the liability insurance carrier of Cire and the latter corporation, under the allegation that it was the employer of Cire and that at the time he was acting in its service and within the scope of his employment.

In the district court there was judgment for plaintiff for $1,060.63 against Cire and the Gulf Insurance Company, but the suit as against Katz & Besthoff, Limited, was dismissed. The two defendants cast have appealed and plaintiff has answered the appeal praying for an increase in the amount awarded. Accordingly, we are not now concerned with the claim against Katz & Besthoff, Limited.

The charges of negligence against Cire are that, as he approached young Jefferson from the rear at a speed of about 35 miles per hour, he failed to allow sufficient space for the boy's bicycle to pass around the stalled car; that he should have realized that it was necessary for the boy to turn to his left in order to go around that car, and that he, therefore, in effect carelessly trapped the boy in the rear of the other car and then negligently ran him down as the boy turned slightly to the left.

Defendants deny that Cire was negligent in any particular. They aver that there was ample space for the boy to pass around the other car and that, just as the Cire car was passing him, he suddenly turned to his left and ran into the right rear side of the Cire car. Defendants charge that, even if Cire was negligent in any way, the proximate cause of the accident was the contributory negligence of young Jefferson in three particulars, namely: (1) In not maintaining a proper lookout and in failing to see, at the proper time the stalled car ahead of him; (2) in not having his bicycle under proper control; and (3) in suddenly veering, or swerving his bicycle to the left into the right rear portion of the Cire car. They also allege that he should have extended his hand as an indication of his intention to swerve to his left.

There were few eyewitnesses. The boy himself, though he had seen automobiles to his rear when he was some distance from the stalled car and when the nearest of the approaching automobiles was about one-third of a block away, says that he had veered gradually to his left "just enough to let me pass the car and I was struck from behind."

Roland Russell states that, though he was not looking at the exact moment when the impact occurred, he was on or near the sidewalk and saw Jefferson as he was being lifted from the street just after the accident. Russell states that Jefferson was picked up "somewhere in the vicinity of the left front wheel—alongside the left front of the stalled car" and that the bicycle had been knocked some 6 or 7 feet further on. This is interesting in that it is at variance with one of defendants' most important witnesses, McConnell, who states that the impact occurred before Jefferson reached the stalled car—in fact, "about four feet to the rear of the stalled car."

The credibility of Russell is attacked by defendants, who express doubt as to whether he was present at all. They point to the fact that, though the police arrived shortly afterwards and attempted to locate witnesses, he did not give his name and did not tell any one that he knew anything about the occurrence.

John E. Pell stated that he saw the collision and that it occurred just as the boy was alongside the stalled car; in fact, he says that he looked over the hood, or front end of the stalled car. He makes a most damaging statement to defendants' cause when he says: "I saw the car when it turned out trying to pass another car running alongside the neutral ground."

What he meant was that the Cire car was in a moving line of traffic near the neutral ground and that, just as it was nearly opposite the stalled car, Cire turned it to his right out of that line of traffic in an effort to pass some of the cars ahead of him and that it was this maneuver to his right which brought him into the rear of the boy on the bicycle. Pell states that he thought that some part of the Cire car struck the handle bar of the bicycle. While there is little or no corroboration of Pell's charge that Cire veered to his right to pass around other traffic, we find it interesting because such movement would account for Cire's position near the middle of the street in the line in which the bicycle was, rather than near the neutral ground, which, in spite of the legal requirements to the contrary, is shown and known to be the ordinary position of automobiles whose operators are "in a hurry," as Cire was shown to be. The street was some 35 feet wide. Allowing for the width of the two automobiles and for a foot or two between the line along the curb and the stalled car, Jefferson, as he passed the stalled car, was some 16 or 18 feet from the sidewalk. There was, then, from 17 to 19 feet between him and the neutral ground. If, then, there was no other traffic on the street, there was no reason for Cire to be sufficiently far over to cause any danger whatever to the young boy. We say this in spite of the fact that, of course, under the ordinance of the city, No. 13,702, C.C.S., it was Cire's duty to drive to the right, and we say it because of what we have already said concerning the custom of motorists to stay close to the neutral ground. At any rate, if there was no other traffic, he had ample room to pass around Jefferson, who was somewhere near the middle of the street, since, to Jefferson's left, there yet remained, as we have said, some 17 to 19 feet of open roadway.

McConnell, to whose testimony we have already referred, not only maintains that the impact took place before the bicycle had reached the rear of the stalled car, but he states that "the boy on the bike cut to his left and ran into the right rear fender of the Cire car" and that the boy fell from the bicycle "about four feet to the rear of the stalled car." He states, however, that the bicycle and the Cire car were being operated at about the same speed—20 miles per hour. We are convinced that the automobile was running much faster than was the bicycle and, in fact, that the bicycle, at maximum speed, could scarcely exceed 20 miles per hour. McConnell's testimony is palpably inaccurate when he states that the boy was not taken into his place of business after the accident, for the record as a whole leaves no room for doubt that the boy was taken into his place of business and was there treated. Yet McConnell states that "he was not taken anywhere. He brushed himself off. He said he was O. K., jumped on his bike, and ran off."

In at least one more particular McConnell is shown to have been inaccurate. He says that the bicycle and the automobile were proceeding at the same speed—in

fact: " * * * I think the bike was going faster than the automobile at the time, it looked to me." He says in the same answer that "they were practically 'head-and-head.' " If they were practically "head-and-head" and the bicycle was going a little faster, we cannot understand how the bicycle swerved into the left rear fender of the automobile.

A photograph of the automobile shows dents on its right rear fender and it is contended that these dents were caused by contact with the bicycle and that they indicate that defendants' theory of the accident is the correct one. But it is entirely possible that the bicycle was struck by the front of the automobile and was then knocked back and forth once or twice, possibly between that automobile and the stalled car, and then struck the rear fender as the Cire car passed by. At any rate, even if the dents were caused by contact with the bicycle, that fact does not, of itself, show conclusively that it was at that point that the first contact occurred.

Another witness of defendants presents a different picture. He says that the bicycle overtook the car and swerved into its side and that the collision occurred after the bicycle "had gained on the car."

Cire himself makes no satisfactory explanation. According to his testimony he was not behind the bicycle and the bicycle had at least 6 feet within which to pass between his car and the stalled car.

Viewing the record as a whole, we conclude that, as Jefferson approached the stalled car, it should have been apparent to Cire, approaching in the rear, that the boy must alter his course to pass around that car. Under such circumstances, Cire should have exercised extreme caution to avoid striking the boy or creating a situation which might unduly alarm him. The facts, as we find them, are remarkably similar to those involved in Bosarge et ux. v. Spiess & Co. et al., La.App., 145 So. 21, 22:

"There is a dispute as to whether or not the boy swerved from his course because of a parked automobile which was in front of him. Plaintiffs assert that there was such a car present and that the driver of the truck should have seen it and should have realized that the boy, in order to pass it, must swerve to his left; whereas, the driver maintains that there was no such parked car present and that the boy, without any necessity, turned from his course and into the path of the oncoming truck. On this point we feel that the evidence supporting the view of plaintiffs preponderates and that the boy turned in order to avoid striking the stationary automobile ahead of him. The truck driver should have appreciated the necessity for the boy's action in turning and should have anticipated that he would do so."

■ There, as here, it was charged that the action of the bicycle rider in swerving to go around the stationary vehicle constituted contributory negligence. We do not think it was negligence here and we did not think it was in that case. We said:

"While a boy of the age and intelligence of plaintiffs' son may be expected to understand and appreciate the danger of turning into the path of a truck, we do not feel that his action in this instance should bar recovery because he was warranted in assuming that no automobile driver, approaching from his rear and seeing both him and the parked car, would attempt to pass so close to the latter as to leave no room for the bicycle."

■ The doctrine which is applicable to such a situation is that designated by the descriptive words "discovered peril." This doctrine provides that, even though a plaintiff may be negligent, there may be recovery if the negligent defendant, having seen and appreciated the peril of the plaintiff and having realized plaintiff's inattention, fails to avail of reasonably obvious precautions to avoid injuring him. And this is true even though the plaintiff himself may to some extent be negligent in not discovering his own peril and in not avoiding it. Here, assuming that Jefferson was negligent in turning to the left to go around the stalled car, it was obvious to Cire that he intended to do so and it was also obvious that he did not realize the danger of doing so. There was ample opportunity for Cire to stop entirely, or to swerve to his left to pass around the bicycle. In other words, he not only saw Jefferson, but he "discovered," or realized Jefferson's impending peril and that Jefferson was himself unaware of it.

■ It is also said that Jefferson was negligent in not extending his hand to indicate his intention to swerve to his left. The ordinance to which we have above referred—No. 13,702 C.C.S.—provides for a hand signal from a bicycle

rider upon making a turn. Assuming, however, that the swerve to the left made by Jefferson was within the contemplation of the ordinance which refers to a "turn," whereas it is contended that this was merely a gradual swerve, we do not think that the failure to give a signal played any part in the ensuing collision. Nothing could have been more clear than the fact that a maneuver to the left was to be made since Cire could see that the boy was immediately behind the stalled car and must turn slightly to the left, and a hand signal would have added nothing to what he could already see. The necessity for the change in direction must have been obvious.

■ We feel that the cause of the accident was the negligence of Cire and that, therefore, judgment was properly rendered against him and against his insurance liability carrier, which latter is made defendant under Act No. 55 of 1930.

■■ We next consider the extent of Jefferson's injuries. He sustained two linear fractures of the skull, one of the right temporal bone and the other of the left occipital bone. He also sustained a hematoma of the scalp, contusions of the head, and laceration of a finger. He was taken to the Charity Hospital on October 9, 1935, and was discharged on October 24, 1935, and on his return home was required to remain in bed for the ensuing two weeks. His family physician who treated him at home was not produced, but his mother testified that his hearing seems to some extent to have been permanently impaired and the record indicates that his eyesight has also to some extent been affected. He says that he sustained terrible pain and that he suffered greatly during the entire period of hospitalization. He returned to work at the end of about seven weeks, but he states that he was really not able to work, but did so because he and his brother were the sole support of their mother.

The record shows that immediately after the accident and after first-aid treatment in the automobile establishment he said that he was all right and that he could ride his bicycle back to his place of business, but that this was the result solely of nervous reaction, because, only a few blocks distant from the place of the accident, in attempting to ride his bicycle back to his employer's place of business, he is shown to have collapsed and to have been taken to the hospital.

We have examined many cases involving skull fractures, but have found only two which we think present injuries substantially similar to those involved here.

In Guillot v. Baton Rouge Yellow Cab Co., 18 La.App. 202, 138 So. 219, there were two fractures of the skull and the hearing was to some extent affected. The Court of Appeal increased to $3,000 the award of the district court, which had been $2,000.

In Gauvereau v. Checker Cab Co., 14 La.App. 448, 131 So. 590, this court awarded $2,500 for a single skull fracture where the injured party had to some extent lost the sense of taste.

In Harrison v. Shreveport Yellow Cab Co., La.App., 142 So. 724, which is relied upon by defendants, $1,000 was allowed to the plaintiff, who sustained a single fracture of the skull and who was required to remain in the hospital eight days.

In Breen v. Walters, 150 La. 578, 91 So. 50, also relied upon by defendants, the injured party sustained a single fracture of the skull and $1,000 was allowed, but there no application for an increase was made by the plaintiff.

In Young v. Carnahan Creamery, La. App., 157 So. 616, which also is a case in which a single fracture of the skull was sustained, there was, in addition, a broken collar-bone, and it was held that $1,500 was not excessive.

In Cusimano v. Spiess Sales Co., 153 La. 551, 96 So. 118, plaintiff sustained a single fracture of the skull and was in the hospital less than ten days. $3,000 was allowed.

We think that the two first cited cases, Gauvereau v. Checker Cab Co., supra, and Guillot v. Baton Rouge Yellow Cab Co., supra, involve injuries somewhat similar to those with which we are now concerned, but we believe that in each of them the injuries were more serious than those suffered by young Jefferson. An allowance of $2,000 seems to us to be justified. In addition, of course, the judgment, in so far as it awarded Jefferson $60.63 for wages lost, was correct. The claim for medical expenses, $173.50 was properly rejected because the evidence showed that these were voluntarily paid by Jefferson's employers.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is amended by increasing the

amount thereof to $2,060.63, and that, as thus amended, it be and it is affirmed at the cost of appellants.

Amended and affirmed.