JANVIER, Judge.
Jessie N. White, employed by Eustis Engineering Company, hereinafter referred to as Eustis Company, as operator of a power plant on a drilling barge lying alongside other barges moored at the west bank of the Mississippi River opposite New Orleans, sustained injuries when the clevis or large hook, which was on the end of a cable used in pulling a large pipe from the bed of the river, became disengaged from the cable to which it was attached with the result that a large block or pulley fell from the top of a derrick and struck White on the head. He sustained a skull fracture which required two operations, and he was disabled for a few weeks. He then returned to work for his employer and has continued to do the same work in which he was previously engaged.
The employer, Eustis Company, had secured compensation insurance from Employers’ Liability Assurance Corporation, Ltd., and that company, hereafter referred to as Employers’ Company, paid to White compensation amounting to $100 covering the period of his disability, and it also paid various medical, hospital and other such bills made necessary by the accident.
Employers’ Company and White then brought this suit against Excel Machine Works, Inc., hereinafter referred to as Excel Company, and Michigan Mutual Liability Company, alleging that the latter was the liability insurer of the former and that the former had connected the clevis to the cable; that the connection had been defectively made and that the accident had resulted from this defective connection. Later it was conceded that the liability policy, which had been issued by Michigan Mutual Liability Company to Excel Company, did not cover the particular kind of liability which was involved here and, on joint agreement of counsel for all parties, the exception which had been filed by the “Michigan” Company was maintained and the suit as against that company was dismissed.
After filing an exception of vagueness, the Excel Company filed answer admitting that it had made the connection between the wire cable and the clevis, both of which had been furnished by the Eustis Company, that the accident had occurred, and that White had sustained injury. However, it denied that it was in any way liable for the injury to White, averring that the connection between the clevis and the cable had been made in accordance with specific instructions given to it by the Eustis Company. It also averred that the accident had resulted not from the defective connection between the clevis and the cable, but as a result of the fact that, in operating the machine by which the Eustis Company was attempting to pull the pipe from the bed of *681 the river, White had applied to the cable too much strain and pressure and that the connection had pulled apart as a result of this negligent operation of the machine and that, since the machinery was operated by White, no recovery could be had. Excel Company further specially pleaded that White was guilty of contributory negligence in that he failed to make use of a metal helmet provided by his employer and which, if used, would have prevented the injury to his head, which resulted when the block or pulley fell upon it.
While we do not find in the record any exception or plea which expressly raises the issue, we note in the briefs of all parties, and we were told in oral argument, that defendant contends that, as a matter of law, it cannot be held liable to White or to the Employers’ Company for the reason that there was no privity of contract between White, the injured third person, and defendant, Excel Company. In other words, it is now contended by Excel Company that, since the work which it did was done for the Eustis Company and not for White, and since the work was completed by it and then was accepted by the Eustis Company, there is no right of action in White, a third person, to hold Excel Company liable.
After a trial on the merits, there was judgment against Excel Company in favor of White for $1,500 and in favor of Employers’ Liability Assurance Corporation, Ltd., for $580.57, for amounts paid to White in compensation and to the various doctors,hospitals, etc. for services rendered to White.
Our addition of the amounts paid in compensation, $100, and for medical and related bills, $465.57, totals only $565.57 and not $580.57. However, no objection was directed at this fact and we shall accept the total as $580.57 as stipulated. De minimis non curat lex.
From that judgment Excel Company has appealed suspensively and White has answered the appeal, praying that the amount awarded to him be increased to $10,000 as originally prayed for.
Since the contention, that White has no right to proceed against Excel Company because there was no privity of contract between him and that company, raises a question of law which, if decided in favor of Excel Company, would result in the dismissal of the suit without requiring that the facts of the matter be investigated, we shall first consider that question of law.
It is conceded that Eustis Company employed Excel Company to connect the cable and the clevis, and that when the work was completed, the cable and connected clevis were received by the Eustis Company. The question of whether a manufacturer who has manufactured a defective article, or a contractor who has done defective work, which defect in either case has caused damage to some other person, may be sued by that other person is a much discussed one, and on it there have been, for a long time, two divergent views. We think it unnecessary to discuss the question at length. We did so in Marine Insurance Company v. Strecker, La.App., 89 So.2d 517, 521, and, with one Judge dissenting, held that, under the facts shown there, the third person, who had been caused loss, could not maintain an action against the contractor. We said:
“ * * * there is no liability here since there was no contractual relationship between the contractor, defendant, and the tenant [the third person.]” (Brackets ours.)
However, a writ of certiorari was applied for and was granted by the Supreme Court, and when the matter was heard in that Court our opinion and decree were reversed (April 1, 1957) and, with one Justice dissenting, the Supreme Court held that there could be liability under those facts. The Court discussed the question of possible liability, of a manufacturer of an article, which, if defective, may be *682 dangerous, and held that, if the manufacturer permits defects to be in the article, there may be liability to a third person injured as a result of the defects. The Court then said that there is a growing tendency to permit such third person to sue a manufacturer, or a vendor, or a contractor whether the defect be in the article or in the work performed by a contractor, and held that the contractor, under the facts shown in that case, might be held liable, saying:
“ * * * Several recent decisions have placed building contractors on the same footing as sellers of goods, and have held them to the general standard of reasonable care for the protection of anyone who may fore-seeably be endangered by the negligence, even after acceptance of the work. * * * ”
The Supreme Court has now granted a rehearing (May 6th, 1957) in that case and it may be that, on rehearing, it will adopt the views originally expressed by us.
Whatever may be the final decision there, we think that, in the case at bar, the facts present sufficient distinction to justify a holding that the injured third party may proceed directly against the contractor if it appears that the injury resulted from defective work of the contractor.
The distinction lies in the fact that here it is contended that the defect made itself apparent immediately after the work was delivered by the contractor, and that there was no possibility that it might be said that the injury did not result from that defect if there was a defect.
Another distinction lies in the fact that here, if there was a defect, it obviously resulted from the negligence of the contractor in the performance of the work, whereas in the Strecker case the defect was not in the work of the contractor, but was in a piece of hardware which the contract- or had purchased in the regular course of business from a hardware dealer.
'■ In view'of the fact that in this case the article caused the injury at the very first instant at which it was put to use, we conclude that there is a right in White and consequently in the Employers’ Company,, as subrogee, pro tanto to maintain an action against Excel Company. Consequently, if it appears that the injury resulted from defective work done by Excel Company for Eustis Company, White and Employers’ Company may recover. Let us then consider the facts.
Eustis Company was engaged in securing from the bed of the Mississippi River samples of the mud or earth into which must be driven pilings for the foundations of the Mississippi River bridge which is now under construction. These samples were to be tested in an effort to determine how deep the pilings should be driven. In securing these samples, large six inch pipes were driven into the bed of the river and then smaller pipes or tubes three inches in diameter were driven inside the six inch pipes. These smaller pipes were then drawn up and the earth or mud packed in them from the bed of the river and withdrawn was to be tested.
There was a drilling rig maintained on a barge and from this the pipes were driven and withdrawn when filled with earth. The larger pipes were then pulled up from the bed of the river. A crane was- employed and a cable was operated through a pulley or snatch block at the top of the crane and at the other end of the cable was the hook or clevis which was attached to the end of the pipe to be pulled up from the bed of the river.
This clevis was or should have been attached to the cable in the following manner : Through the upper part of the clevis, which upper part is about 2Yz inches thick, there is a hole which is tapered, being one-half inch in diameter at the top and about three-quarters of an inch in diameter at the bottom. The end of a half inch wire cable is inserted through the hole at the smaller end and out through the larger *683 hole at the other end. About one and a half inches of cable is extended through the hole and the strands of the cable are then completely separated from one another into a kind of rosette and each is turned or doubled back along the body of the cable and the doubled end is then drawn and driven back into the hole in the clevis. Then there is driven into the doubled end of the cable a pin known as a dowel, which is tapered so that when the pin is inserted and it is driven in, it jams the cable so tightly in the tapered hole in the clevis that it is impossible for the cable to be drawn out when pressure is placed on the cable by the lifting machine.
After the pin is inserted molten babbitt metal is poured over the end of the cable and this metal in its liquid form permeates the entire end of the cable and makes it doubly secure. The tapered dowel pin, to which we have referred, is applied very much in the same manner as is the wedge which is driven into the smaller end of the wooden handle in the head of an ordinary hammer to expand the end of the handle and firmly fix it in the head.
The cable, as already stated, had been connected to the clevis by the Excel Company, and White had replaced an older cable with this one and had just commenced to exert pressure in an effort to remove one of the large six inch pipes from the bed of the river when the cable pulled loose fom the clevis, with the result that' the snatch block or pulley, which was at the top of the derrick or crane, fell fom its position and struck White on the head.
The entire question presented to us depends on a determination of whether the cable was properly attached to the clevis by the Excel Company. On behalf of that Company it is contended not only that it was properly connected, but also that that operation was performed exactly in compliance with the detailed instructions which had been given to the Excel Company by employees of the Eustis Company. Much evidence is devoted to the question of whether these instructions were given by the Eustis Company. We need not determine whether such instructions were actually given, for the reason that all parties agree that the connection should have been made just as we have described it, and a solution of the controversy depends not on whether the instructions were given, but on whether the cable was attached in the manner which all agree was correct.
There is no doubt at all that the cable did pull out of the clevis and that this was the cause of the accident. The cable did not break.
On behalf of Excel Company two witnesses testified that they had made the connection and that it was made exactly as described. John W. Denham, a blacksmith and welder of that company, says that he made the connection and that in doing so he was helped by Earl F. Lovas, a machinist in the employ of the Excel Company. However, the evidence produced by the plaintiffs is overwhelmingly convincing that, for some unexplained reason, a most important part of that operation was overlooked. The end of the cable was not doubled back when it was inserted through the hole in the clevis. It is shown that when the clevis pulled off the cable, its ends showed no signs of being doubled back or of the strands of the cable having been separated from one another.
Curtis L. Lundstom, Jr., employed by Eustis Company, when asked whether the cable, which had pulled out of the clevis, had “the strands bent down”, answered: “It definitely did not.”
James L. Gore, a civil engineer employed' by the Eustis Company, was present when the accident occurred and, though he did not see the end of this particular cable, said that if the strands of the end of the cable had been separated as they should have been ■ “they would have evidence of being frayed * * * »
Fred M. Henderson, a machine operator employed by Eustis Company, was present when the cable pulled out of the clevis. He *684 examined the end of the cable after it had pulled out and says that there was no indication on its end that the wires had been separated and “V” shaped so that they could be pulled back into the tapered end of the hole in the clevis.
While the cable itself was not offered in evidence, there was produced a sample cable which all admitted was similar to that involved in the accident, and we are convinced from an examination of that cable that if the various strands had been separated and doubled back, even if it had pulled through the hole when pressure was applied to it, the end would not have remained in the original condition in which it was before the strands were separated. Witnesses who saw the cable after the accident say that its end was just as smooth as it would have been had the cable been merely cut off and inserted through the hole in the clevis and then affixed by the mere pouring of molten babbitt metal over it.
Furthermore it is shown that the babbitt metal which should have been poured over the junction and should have permeated the entire cable apparently was poured only over the top of it and was not more than about a quarter of an inch thick when the cable pulled away from the clevis.
But most important of all, we consider the fact that the record, which includes testimony of an employee of defendant itself, shows that if the cable had been properly attached to the clevis, the cable itself would have broken before the end of the cable could have pulled through the hole in the clevis.’
Denham, the employee of the company who made the connection, gave the following testimony:
“Q. If you had put it in there the way you described by inserting it through the clevis and bending the wires over and driving the dowel in and putting the babbitt in, would it have held up ? A. It should have until the cable broke.
“Q. Until the cable broke, isn’t that right? A. That is right.
“Q. In other words, it would be stronger than the cable itself, wouldn’t it? A. That is right.
“Q. In other words, this connection by this process of inserting the cable with ends frayed over into this conical part of the clevis, would be stronger? A. Should be.
“Q. Than the cable itself ? A. Should be.
“Q. So the cable should have parted somewhere down the line? A. That is right.
“Q. And not at that joint or connection ? A. That is right.
“Q. Before that thing would have pulled out, isn’t that right? A. That is right.
“Q. Did you ever know any of them to pull out in all the experience you have had fixing these things ? A. No, sir.”
Practically all witnesses corroborated this.
Inasmuch as defendant made the contention that the clevis pulled off the cable because too much pressure was applied to it by White, we merely answer that contention by stating that the evidence shows that very little pressure had been applied when the union between the cable and the clevis gave way.
All of the witnesses who were present say that very little tension was applied. Henderson, to whom we have already referred, said that the floating barge on which the derrick was located would “go down” slightly if much pressure had been applied in attempting to pull up the pipe and, at that particular time, the vessel did not “go down” at all. He stated that dur *685 ing the morning, when the earlier attempts were made to pull up that pipe, so much pressure had been applied that the barge had gone down noticeably.
Another contention of defendant is that, at the time of the accident, White was engaged in “dogging” the pipe, that is, in applying extreme pressure in jerks. In the first place, the evidence shows that at that time White was not engaged in “dogging” the pipe, and, in the second place, we again point to the fact that the record convinces us that, if the connection between the cable and the clevis had been properly made, the cable itself would have given way before it would have pulled out of the clevis and this is true whether White was engaging in “dogging” the pipe or in merely exerting pressure upon it.
The contention that White was guilty of contributory negligence in that he was not wearing the protective helmet which is provided by the Eustis Company cannot be accepted as sound. The record shows that the employees were not required to wear these helmets and we do not see that it could be said to be negligence on the part of White to fail to wear the helmet under the circumstances shown.
Counsel for defendant points to the fact that in spite of this occurrence, the Eustis Company has continued to employ the Excel Company in making similar connections, and it is argued that the Eustis Company must have felt that the Excel Company was not negligent in this case or it would not have continued to employ it for such work. For sometime in the past, the Excel Company had performed this same operation many times for the Eustis Company and its services in the past had always been satisfactory. The mere fact that on this one occasion there was carelessness would not justify the Eus-tis Company in refusing to ever again employ that company.
We have no hesitation in reaching the conclusion that the accident was caused by the negligence of Excel Company in not properly attaching the cable to the clevis, and accordingly, there is liability in the Excel Company to White for his injuries and to Employers’ Company for such amounts as it was required to expend as a result of the injury to White. '
At first it seemed that the accident would have a very serious and a permanent effect since it involved a skull fracture. Fortunately, however, it soon developed that the injury was not so serious as might have been expected. White was disabled for a little less than five weeks and though he was required to undergo two cranial operations, it is now obvious that there is no permanent disability and no danger of any future disability.
Dr. Howard Karr, when he last saw White, which was on January 26, 1954, reported that at that time White “was doing a full day’s work without difficulty.” He also said that though White had had headaches, they “were gradually going away.” And Dr. Karr completed his report by stating that White “had no residual disability.”
White himself stated that he had at first experienced excruciating pain and for about eight months had periodic headaches, but, with refreshing and commendable frankness, he stated that these headaches were disappearing and that he would not classify them as headaches. He said: “I wouldn’t exactly call them a headache, but now, maybe two or three sharp pains and that will be it.”
We have considered many cases in Louisiana involving skull fractures and find that there have been quite a number.
In Wilson v. Williams, La.App., 82 So.2d 71, a young girl five and a half years old, who sustained a fracture at the base of the skull and whose collarbone was fractured, was allowed $5,000. There was evidence of a ruptured eardrum and a slight concussion of the brain and for a short *686 time there was serious doubt that she would survive.
In Webb v. Dunn, La.App., 15 So.2d 129, the Court of Appeal for the Second Circuit allowed $2,200 to a truck driver, who suffered a severe fracture at the base of the skull, had continuing headaches, and whose hearing might be permanently impaired.
In Blanke v. Miranne, La.App., 11 So.2d 264, we allowed $2,500 to a woman who suffered a fracture at the base of the skull with the loss of her sense of smell and of taste, which would not. be permanent.
In Lambert v. Cire, La.App., 179 So. 112, 116, we awarded $2,000 to a plaintiff who “sustained two linear fractures of the skull, one of the right temporal bone and the other of the left occipital .bone.”
In Young v. Carnahan Creamery, La.App., 157 So. 616, the plaintiff sustained a single fracture of the skull and a broken collarbone, but apparently there was no permanent effect, and the injury was treated as rather slight. ' He was allowed $1500.
In Harrison v. Shreveport Yellow Cab Co., La.App., 142 So. 724, the Court allowed only $1,000 to a plaintiff for a single skull fracture. He remained in the hospital only eight days.
In Guillot v. Baton Rouge Yellow Cab Co., 18 La.App. 202, 138 So. 219, the plaintiff sustained two fractures of the skull and his hearing was slightly affected. The Court of Appeal for the First Circuit increased the award from $2,000 to $3,000.
In Guinn v. Kemp, 18 La.App. 3, 136 So. 764, Mrs. Guinn sustained a fracture of the skull, puncture of the eardrum, permanently impairing her hearing and suffered severe pain for a week or ten days. However, the Court awarded only $1,200 for these injuries.
In Gauvereau v. Checker Cab Co., 14 La.App. 448, 131 So. 590, we allowed $2,-500 where the plaintiff sustained a single skull fracture and to some extent lost the sense of taste.
In Cusimano v. A. S. Spiess Sales Co., 153 La! 551, 96 So. 118, 120, a plaintiff was allowed $3,000 for a “fracture at the. base of the skull”. He was required to remain in a hospital about a week or ten-days and the Supreme Court said that though doubtless “the pain was great and the shock to the nervous system severe,” since the evidence was very meager, $3,000 was sufficient.
In Breen v. Walters, 150 La. 578, 91 So. 50, the plaintiff sustained a single skull fracture and was allowed only $1,000, but no application for an increase in the award' was made.
In several cases larger amounts have been awarded, but in each of them it was shown that there were other injuries and some permanent disability. See Miller v. Derusa, La.App., 77 So.2d 748; Brown v. Chicago, R. I. & P. Ry. Co., La.App., 14 So.2d 307; Pittman v. Hunter, La.App., 6 So.2d 786; Lowery v. Zorn, La.App., 157 So. 826.
The only residual with which plaintiff in the case at bar will suffer is a very slight depression in the skull which the doctors all agree will have no disabling effect.
Under all of the circumstances and considering the fact that a skull injury is necessarily serious, and the further fact that the plaintiff was required to undergo two operations and that he suffered from headaches for about eight months, we reach the conclusion that the amount awarded ($1500) is slightly insufficient and we have decided to increase it to $3,000, this, of course, in addition to the amount awarded to Employers’ Company.
The judgment appealed from is amended by the increase of the amount awarded to-plaintiff, Jessie N. White, to the sum of $3,000, with legal interest from judicial demand and, as thus amended, the judg *687 ment is affirmed; defendant to pay all costs.
Amended and affirmed.